IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SHEILA FOX

      Plaintiff

      vs.

      * CIVIL ACTION NO. MJG-01-1937

THE MARYLAND SCHOOL FOR THE
BLIND

      Defendant

*     *     *     *     *     *     *     *     *

MEMORANDUM AND ORDER

The Court has before it Defendant's Motion for Summary Judgment [Paper 14] and the materials submitted by the parties related thereto.  The Court finds a hearing unnecessary.

I.  BACKGROUND[1]

Defendant The Maryland School for the Blind ("MSB") is an educational institution that serves a population of visually impaired students.  Plaintiff Sheila Fox ("Fox"), a person of limited vision, was employed at MSB as an Instructional Assistant ("IA") from 1993 until 2001.  As an IA, Fox assisted teachers with the instruction of students with disabilities.

---

[1]  In the present summary judgment context, it is necessary to assume that the Plaintiff's version of the disputed facts is correct.

Fox is legally blind, but has limited vision during the daytime. Fox is able to read large print and can navigate in familiar surroundings during the daytime. In other situations, she needs assistance.

Fox attended MSB as a student from 1972 to 1981. After leaving MSB, Fox obtained her GED and took college courses. She is proficient in reading and writing Braille and Nemeth code (Braille Math notation). From 1986 to 1993, Fox volunteered and worked as a substitute at MSB. In 1993, she was hired as a full-time IA. MSB, through the principal, Dr. Starette Galanis ("Galanis"), and Fox's immediate supervisor, Kim Spence ("Spence"), were aware of Fox's visual impairment.

During the 2000-2001 school year, MSB assigned Fox to assist a student, Gary Wayne Krammerer ("Krammerer" or "the Student"), a visually impaired student who was being "mainstreamed" at Villa Cresta ("Villa Cresta") elementary school in Baltimore County. Fox was assigned to work with Krammerer because she had worked with him the previous year and had a good rapport with him and because she had the necessary braille skills.

While at Villa Cresta, Fox worked in the classroom of teacher Stephanie Foy ("Foy"). Fox's duties at Villa Cresta included (1)interlining, handwriting text on a brailled document, the Student's brailled school work so that Foy could read it;

2

(2) helping the Student stay organized; (3) coordinating the transfer of print material that Foy needed brailed between Villa Cresta and MSB; and (4) brailling last-minute material for the Student.

Because of the significance of Krammerer's transfer from MSB to Villa Cresta and the nature of "mainstreaming", the Individual Education Plan team ("IEP team") met frequently, approximately once a month, to review the Student's progress and recommend changes. As school progressed, the IEP team determined that the Student was having difficulty adjusting to the public school program and continued to need the assistance of an IA. Thus, while Fox's placement at Villa Cresta initially was to last two to four weeks, upon reevaluation of the Student's needs, MSB extended the assignment.

Fox began having trouble doing the interlining work because the close and visually demanding nature of the work caused eye strain and gave Fox a headache. Fox also had trouble with the interlining because she was first required to do the work with the materials on her lap and later she was required to work at an elementary-student-sized desk. The desk was so small that Fox was required to sit sideways. These working conditions caused neck and back strain.

3

Fox asked Foy to submit print materials to be brailled by Fox to her in 14 point type.  Foy instructed Fox to have the materials blown up by photocopy.  Having the materials blown up did not work because some of the words got cut off the page.  Fox then requested that Foy submit materials to media support at MSB so that they could braille the materials for her.  Foy, however, continued to submit last minute material to Fox in regular type.  Fox informed MSB staff of the problem, and Foy was instructed in at IEP meetings on November 1st and December 4th to fill out forms for media support so that Fox could take them and have them brailled.  Fox Dep. at 14-15.

Fox first told MSB personnel, Spence, Galanis, Dareen Barrios ("Barrios"), and Renee Keaton ("Keaton"), about her neck and back pain in September.  She did not know the cause of the pain at the time.  Fox Dep. at 93.  Fox told Spence that the interlining was causing her neck pain and requested a reading stand or larger desk on October 30, 2000.  She presented medical documentation of her need for a better work space near the end of November or in early December.  Fox Dep. at 95, 141.  The amount of work Fox was asked to braille and interline increased during November and December.

As an accommodation for her disability, Fox requested that she be allowed to do the interlining work at MSB where there was

a more appropriate work space.  This request was made during the beginning or middle of November 2000.  Fox Dep. at 81.  Fox's request to do the interlining work at MSB was granted in the first or second week of December 2000.  Fox Dep. at 92.  In the beginning or middle of November, Fox also asked that an MSB staff person do the interlining. That request was denied.  In early December, Fox suggested that the Student use a Braille and Speak, a device which would print the Student's work so that Foy could read it without the interlining.  In late December, Fox requested that, in lieu of doing the interlining, she be allowed to read the Student's work onto a tape to which Foy could later listen. These requests were never addressed.

In mid October 2000, Fox went on sick leave due to the headaches and eye, neck, and back strain.  During Fox's two week leave, Kathy McGill ("McGill") another IA was assigned to work with Foy.  McGill is fully sighted.  When Fox returned to work on October 31, 2000,  Foy told her that she preferred to work with a sighted IA.  Foy explained that she preferred a sighted IA because a person who could see could read print material to the Student when it couldn't be brailled and could read from the chalkboard.  Fox was stunned by Foy's comments because Foy had had no previous complaints about her work.  Fox reported the conversation to Spence and Galanis.  Galanis told the assistant

principal at Villa Cresta, Penny Brown ("Brown"), to ask Foy not to "discuss those issues again, or bring up those issues." Brown Dep. at 16. There is no evidence that Brown ever asked Foy not to repeat the comment.

Fox alleges four other incidents where Foy made improper or discriminatory comments. On one occasion, Fox became disoriented after a fire drill because the surroundings were unfamiliar. When she returned to the class room, Foy asked her in a demeaning manner if she had become lost. The second incident occurred when Fox returned to Foy's classroom where children were seated on the floor. According to Fox, Foy spoke in a loud and demeaning manner when she told the children to get out of the way because Fox could not see them. On the third occasion, Krammerer dropped his notebook. As Fox was attempting to reorganize the papers, Foy commented loudly that Fox could not do the job because she could not see. Finally, Foy complained loudly about Fox's inability to see her work while Fox's mother was present.

Despite repeated request, Spence and Galanis refused to reassign Fox. Fox was told that she would remain at Villa Cresta until the Student no longer needed her assistance. At Spence's suggestion, Fox attended two sessions of an employee assistance counseling program prior to January 8, 2001.

6

Beginning in December, Fox began leaving voice mails for Spence and Galanis telling them that she would not be returning to Villa Cresta. On January 8, following the Christmas break, Fox failed to return to Villa Cresta. Fox was informed that she would be suspended if she did not return to Villa Cresta. She returned on January 10 and worked until January 18 when she took family medical leave.

Fox was formally fired on February 8, 2001 during a meeting with William Murphy ("Murphy"), Galanis' supervisor. Fox presented a letter from her psychiatrist at the February 8 meeting. The letter stated that due to extreme stress, Fox had repressed her memory of the events of her employment and that the February 8 meeting should be postponed. The request to postpone the meeting was denied, and Fox attempted to explain her situation. At the conclusion of the meeting, Fox was fired and her request for an internal appeal was denied.

In addition to her problems at Villa Cresta, Fox cites a history of mistreatment at MSB. Over her years at MSB, Fox made numerous requests that the school purchase adaptive technology such as a Braille 'n Speak machine. She also requested a well-lit room in which to fill out forms, brailled and large-print materials for meetings, and to have someone read the small-print dormitory logs to her. All of these requests were denied or

7

ignored.  Fox was subject to embarrassment and ridicule by the
other teachers.  Fox also notes the maltreatment of another blind
employee at MSB, Betty Carroll ("Carroll").

Plaintiff Fox instituted grievance proceedings before the
Personnel Committee of the Maryland School for the Blind to
protest her discharge.  A hearing was held on April 23, 2001.
The grievance panel upheld Plaintiff's termination.

Plaintiff filed the instant lawsuit against Defendant MSB in
July 2001 seeking damages and other relief for Defendant's
alleged discrimination against a blind employee in violation of
Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794.
Fox presents the following causes of action:

|  |  |
|---|---|
| Count I | Failure to Accommodate |
| Count II | Hostile Work Environment |
| Count III | Unlawful Discharge |

In the instant motion, Defendants seek Summary Judgment on
all claims.


II.  SUMMARY JUDGMENT STANDARD

A motion for summary judgment shall be granted if the
pleadings and supporting documents "show that there is no genuine
issue as to any material fact and that the moving party is
entitled to a judgment as a matter of law."  Fed. R. Civ. P.

8

56(c).  The well-established principles pertinent to such motions
can be distilled to a simple statement.

The Court may look at the evidence presented in regard to
the motion for summary judgment through the non-movant's rose
colored glasses, but must view it realistically.  After so doing,
the essential question is whether a reasonable fact finder could
return a verdict for the non-movant or whether the movant would,
at trial, be entitled to judgment as a matter of law.  E.g.,
Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Celotex
Corp. v. Catrett, 477 U.S. 317, 327 (1986); Adickes v. S.H. Kress
& Co., 398 U.S. 144, 158-59 (1970); Shealy v. Winston, 929 F.2d
1009, 1012 (4th Cir. 1991).

III. DISCUSSION

    A.  Failure to Accommodate

Plaintiff alleges that MSB violated the Section 504 of the
Rehabilitation Act of 1973 ("the Act") by failing to reasonably
accommodate her disability.  29 U.S.C. §794.  The Act provides,
in pertinent part,

> No otherwise qualified individual with a
> disability in the United States, as defined in
> section 705(20) of this title, shall, solely by
> reason of her or his disability, be excluded from
> participation in, be denied the benefits of, or be

9

> subjected to discrimination under any program or
> activity receiving Federal financial assistance...

29 U.S.C. §794(a).

Plaintiff is a qualified individual with a disability within the meaning of §705(20) of the Act in that she has a visual impairment which substantially limits one or more of her major life activities. However, with reasonable accommodation Plaintiff can perform the essential functions of her job as an instructional assistant. MSB is a program "receiving Federal financial assistance" and, as such, is governed by the Act. 29 U.S.C. §794(a).

As a covered employer, MSB is required by the Act to provide "reasonable accommodations" to disabled employees in order to secure equal employment opportunities. See Southeastern Community College v. Davis, 442 U.S. 397 (1979); Alexander v. Choate, 469 U.S. 287 (1985). Pursuant to the Act, a federal grant "recipient shall make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program." 28 C.F.R. §41.53 (1990).

Plaintiff contends that MSB was obligated to make reasonable accommodations for her visual impairment, including "a reading

10

stand; a larger desk; use of a tape recorder; the Student's use of a Braille 'n Speak; doing the interlining at MSB instead of Villa Cresta; and ultimately an end to the Villa Cresta assignment."  Pl. Opp. to Def.'s M. for Summ. J. at 17.

Defendant contends that it did make a reasonable accommodation when it allowed Fox to do the interlining work at MSB rather than at Villa Cresta.  Plaintiff acknowledges that this accommodation was made; however, Plaintiff contends the accommodation was made too late and was thus not reasonable.

Reasonable accommodations are defined as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. §1630,2(o)(1)(ii).  Accommodation claims under the Act are analyzed using the same standards utilized under the Americans with Disabilities Act of 1990 ("ADA").  In order to make out a prima facie case under the ADA, a plaintiff is required to show "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position. . .; and (4) that the [employer] refused to make such

11

accommodations."  Rhoades v. Federal Deposit Ins. Corp., 257 F.3d
373, 387 n. 11 (4th Cir. 2001), quoting Mitchell v.
Washingtonville Central School District, 190 F.3d 1, 6 (2nd Cir.
1999).

Defendant disputes whether or not the neck and back problems
constitute a disability under the statute.  Defendant contends
that Plaintiff has presented no evidence that the neck problem
was anything other than a temporary condition which could be
resolved by better working conditions and that Plaintiff has not
presented evidence that the neck and back pain was severe enough
to limit any major life activity.

However, the neck and back problems are not the disability
which Plaintiff contends places her within the purview of the
statute.  Her blindness is the protected disability.  Because she
is blind, Plaintiff requires certain accommodations to allow her
to perform the essential functions of her job.  Plaintiff's
contention is that the failure to provide those accommodations,
i.e. a proper work space, led to the harm to Plaintiff, namely
the neck and back pain.  Thereby, Plaintiff has established the
first element of her prima facie case.

Undoubtably, Plaintiff is an individual with a disability
under the Act; and it is obvious that Defendant was aware of that
disability.  Neither the Plaintiff nor Defendant disputes that

with reasonable accommodation, Plaintiff could perform the essential functions of an IA.  Thus, only the fourth element, whether or not Defendant failed to make a reasonable accommodation is at issue.

The Court is to make the determination of whether or not a particular accommodation is reasonable on a "case-by-case" basis. Bryant v. Better Business Bureau of Greater Maryland, Inc., 923 F. Supp. 720, 733 (D.Md. 1996).  However, while the employer is required to make a reasonable accommodation, "the ADA does not require the employer to provide the best accommodation."  Bryant at 741.  The interpretive guidelines state that an employer "has the ultimate discretion to choose between effective accommodations, and may chose the less expensive accommodation that is easier for it to provide."  29 C.F.R. §1630.9 at 415 (Interpretive Guidance).  Thus, the question is whether or not the accommodation provided was reasonable, not whether it was the best accommodation.

As an accommodation for her problems, MSB allowed Fox to do her interlining work at MSB.  This accommodation was suggested by Plaintiff.  Plaintiff claims, however, that MSB waited too long to allow her this accommodation so that by the time it was allowed, it was no longer reasonable.

13

Plaintiff's contention that Defendant waited too late is not supported by the time-line of events.  Plaintiff did not make Defendant aware of the connection between her neck and back problems and the interlining work until October 30, 2000.  Plaintiff suggested the accommodation of doing the interlining work at MSB in mid-November and provided medical documentation of her problem sometime after November 30, 2000.  The request for the accommodation was granted, according to Plaintiff, during the first or second week of December.  Fox. Dep. at 92.  Thus, the accommodation was granted within three weeks of the request and within two weeks of medical confirmation of the problem.

"The Rehabilitation Act anticipates a flexible interactive process in which the employer and employee work together in order to determine the scope of the employee's limitations, as well as the specific accommodations that would be necessary in order to permit the employee to continue working."  Baucomb v. Potter, 225 F.Supp.2d 585, 594 (D.Md. 2002)(citations omitted).  While a specific request for accommodation is generally the trigger for the interactive process, it need not be.  "Courts have also allowed a communication from a physician to serve as an accommodation request."  Id., citing Bultemeyer v. Fort Wayne Community Schools, 100 F.3d 1281, 1285 (7th Cir.1996); Criado v. IBM Corporation, 145 F.3d 437, 444 (1st Cir.1998).

14

Plaintiff saw a physical therapist on November 30, 2000. Sometime thereafter, she presented to MSB a note from the physical therapist which stated that Fox "would benefit from improved work station for proper positioning." Patient Report Card, Def. Ex. 14. Taking Plaintiff's note from her physical therapist as the triggering event, Defendant instituted an accommodation within one or two weeks.

Furthermore, Plaintiff has presented no evidence that she informed MSB that she continued to suffer the problems with interlining after the accommodation was made.[2] For example, Plaintiff presented no follow-up from her physical therapist as to progress of her condition. Plaintiff makes only a blanket statement that the accommodation was made too late. Plaintiff's conclusory statement is not sufficient to permit a reasonable fact finder to conclude that the requested and permitted accommodation was not reasonable.

Thus, as Plaintiff has not established that the accommodation afforded Plaintiff by Defendant was not reasonable, Plaintiff has failed to prove the fourth element of her prima facie case, "that the [employer] refused to make such

_____

[2] In her deposition testimony, Fox states that she could only do the interlining for 15 minute-blocks of time due to the pain in her neck between November 27 and December 22. Fox Dep. at 194-195.

[reasonable] accommodations."  Rhoades at 387 n.11.  Therefore,
Defendant is entitled to summary judgment on the Rehabilitation
Act claim.


    B.    Hostile Work Environment

    To prevail on her hostile work environment claim, Plaintiff
must prove that (1) she is a qualified individual with a
disability; (2) she was subjected to unwelcome harassment; (3)
the harassment was based on her disability; (4) the harassment
was sufficiently severe or pervasive to alter a term, condition,
or privilege of employment; and (5) some factual basis exists to
impute liability for the harassment to the employer.  Fox v.
General Motors Corp., 247 F.3d 169, 177 (4th Cir. 2001), citing
Brown v. Perry, 184 F.3d. 388,393 (4th Cir. 1999).

    Plaintiff bases her hostile work environment claim on (1)
Foy's treatment of Plaintiff and (2) the generally hostile
environment at MSB. There is no dispute that Plaintiff is a
qualified individual with a disability.  Therefore, the first
element is met.  The Court will next consider the second, third
and fourth elements needed to establish a hostile work
environment.  Was Plaintiff subject to harassment?  Was that
harassment sufficiently severe or pervasive to alter a term,
condition, or privilege of employment?

16

Plaintiff alleges that Foy's statement that she would prefer to work with a sighted IA and her subsequent harassment of Plaintiff establishes these three elements of her claim. There is no dispute that Foy told Fox that she would prefer to work with at sighted IA. In addition to this statement, Fox contends that Foy made a series of comments about her disability which embarrassed her in front of the students and her mother.

"In order to recover on a hostile environment claim, a plaintiff must demonstrate not only that [she] subjectively perceived [her] workplace environment as hostile, but also that a reasonable person would so perceive it, i.e., that it was objectively hostile." Fox, at 178. The Court will proceed under the assumption that Plaintiff subjectively perceived her workplace to be hostile. The question thus becomes whether or not the workplace was objectively hostile. "Factors to be considered with respect to the objective component include 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. at 178, quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993).

The Fox v. General Motors Court found that the plaintiff's workplace was indeed objectively hostile.

17

> Fox offered a good deal of evidence that [his]
> supervisors. . . in vulgar and profane language,
> constantly berated and harassed him. . . [and] Fox
> presented evidence that such harassment occurred at
> least weekly. . .  Moreover, according to Fox's
> testimony, his supervisors' harassment exposed him to
> some physical harm. . . .  A fact finder could conclude
> from this evidence that the harassment Fox experienced
> was frequent, severe, physically harmful, and
> interfered with his ability to do his job.

Fox at 179.  In Statzer v. Town of Lebanon, Virginia, a District

Court in the Fourth Circuit applied the Fox Court's rationale in

determining that a man who had been subject to ridicule about his

speech impediment had not presented facts demonstrating

harassment that was "sufficiently sever or pervasive to alter a

term, condition, or privilege of employment."  2001 WL 710103,

*5. (W.D.Va. 2001).

Viewing the evidence in the light most favorable to

Plaintiff, the Court accepts as true Plaintiff's allegations

concerning Foy's comments.  However, while Foy's comments were

distasteful and offensive to Plaintiff and the Court, they do not

rise to the required level of harassment.

Furthermore, even if the Court were to find that these five

statements constituted harassment, Plaintiff has not established

the fifth element of the hostile work environment case.  Some

factual basis must exist to impute liability for the harassment

to the employer.  Defendant conceded knowledge of Foy's initial

18

statement about preferring a sighted IA.  Plaintiff acknowledges
that MSB made some response to Foy's initial comment, however
inadequate.  Pl's Opp. to Def.'s M. for Summ. J. at 21.  However,
Plaintiff has presented no evidence that Spence, Galanis, or
anyone at MSB had knowledge of any of the other comments.  Fox
only says that she told Murphy of these comments at the meeting
in February after she had already been recommended for discharge
and where she was fired.  Fox Dep. at 216-220.  If, indeed, Fox
suffered indignities at Foy's hands, she suffered them in
silence.  Plaintiff has presented nothing to indicate that MSB
should be held liable for Foy's misconduct.

     Fox also attempts to establish her hostile work environment
claim by proving that MSB was generally hostile to blind
employees.  Fox points to MSB's failure to accommodate and MSB's
discrimination against former employee Betty Carroll.  As
discussed above, Plaintiff's failure to accommodate claim fails,
and, therefore, cannot support the hostile work environment
claim.

     Plaintiff presents the deposition testimony of Carroll
wherein it is alleged that Carroll (who was also blind and a
former MSB employee) was discriminated against and denied
accommodation by MSB.  This evidence, if admitted, would do
nothing to establish that the Plaintiff experienced a hostile

work environment.  Plaintiff cannot prove that she experienced a
hostile work environment by pointing to the experiences of other.
See e.g. Gleason v. Mesirow Fin., Inc., 118 F.3d 1134, 1144 (7th
Cir. 1997) (emphasizing the weakness of evidence of co-workers'
experiences, even when it occurred in the plaintiff's presence,
and concluding that such evidence could not support a hostile
work environment claim); Burnett v. Tyco Corp., 203 F.3d 980, 981
(6th Cir. 2000) (only considering instances of alleged harassment
that were directed to the plaintiff and were within the
plaintiff's knowledge); Caldwell v. ServiceMaster Corp., 966
F.Supp. 33, 50-51 (D.D.C. 1997) (not considering co-workers'
experiences of harassment unless the plaintiff was either the
object of such harassment or witnessed the harassment).

    Plaintiff cites Collier v. Ram Partners, 159 F.Supp.2d 889
(D.Md. 2001) for the proposition that conduct targeted at persons
other than the plaintiff may be considered proof of a hostile
work environment.  See Collier at 898-899.  However, the
situation in Collier is clearly distinguishable in that the
offender in Collier, while never calling the plaintiff any
derogatory names, constantly used racial epithets about persons
in the plaintiff's racial group in the plaintiff's presence.
Thus, Collier would only be applicable to the instant case if
offenders at MSB made derogatory comments not directed

specifically at Plaintiff but about blind people in the presence of Plaintiff. No such evidence is produced in the Carroll deposition testimony.

Plaintiff has not presented evidence sufficient to establish a hostile work environment. Therefore, Defendant is entitled to summary judgment on this claim.


C.    Retaliation/Unlawful Discharge

Plaintiff's unlawful discharge claim is, in essence, a retaliation claim under Section 504 which incorporates the anti-retaliation anti-coercion provisions of the ADA, 29 U.S.C. §794(d). The Fourth Circuit analyzes retaliation claims under the burden-shifting scheme set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804 (1973). See Smith v. First Union National Bank, 202 F.3d 234, 248 (4th Cir. 2000). The plaintiff must first establish a prima facie case by showing that: "(1) she engaged in a protected activity; (2) the employer took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the asserted adverse action." Von Guten v. Maryland, 243 F.3d 858, 863 (4th Cir. 2001); citing Bealle v. Abbott Labs, 130 F.3d 614, 619 (4th Cir. 1997). Once the plaintiff establishes a prima facie case of

retaliation, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action.  Id.

If the employer can do so, the burden then shifts back to the plaintiff to prove that the defendant's purported reason was mere pretext and that there was retaliation.  The plaintiff can do this by showing "'both that the reason was false, and that discrimination was the real reason' for the challenged conduct." Jimenez v. Mary Washington College, 57 F.3d 369, 378 (4th Cir. 1995), quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993).  Thus, the plaintiff's claim "should not be submitted to a jury if there is evidence that precludes a finding of discrimination, that is if 'no rational fact-finder could conclude that the action was discriminatory.'"  Rowe v. Marley Co., 233 F.3d 825, 830 (4th Cir. 2000), quoting Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135 (2000).

Plaintiff has failed to carry her initial burden of establishing a prima facie case of retaliation.  The protected activity Plaintiff claims to have engaged in was refusing to report to Villa Cresta in protest of or in opposition to the lack of accommodation and the hostile work environment.  The Fourth Circuit has clearly articulated what activities constitute opposition.  "Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and

voicing one's opinions in order to bring attention to an employer's discriminatory activities."   Laughlin v. Metropolitan Washington Airports Authority, 149 F.3d 253, 259 (4th Cir. 1998). Fox failed to take advantage of any of the formal or informal grievance procedures available to her.   And while not required to file a formal complaint, Plaintiff is not allowed simply to decide not to go to work in protest of what she perceived to be a failure to accommodate or a hostile work environment.   As with Title VII, Section 504 was "not intended to immunize insubordinate, disruptive, or nonproductive behavior at work." Laughlin at 260, quoting Armstrong v. Index Journal Co., 647 F.2d 441, 448 (4th Cir. 1981).

To determine whether Plaintiff engaged in legitimate opposition activity, the Court balances "the purpose of the Act to protect persons engaging reasonably in activities opposing...discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel."   Laughlin at 259 (emphasis added).   Applying the test to the facts of the instant case, it is clear that MSB's interest in insuring that the Student had adequate instructional assistance and that the IEP was properly implemented outweighs Fox's prerogative to refuse to do her job at Villa Cresta in protest of perceived mistreatment.   Fox's

23

response to the situation at Villa Cresta was "disproportionate and unreasonable under the circumstances" and was not "akin to the measured responses to employer discrimination" protected under Section 504. Id. at 260. Because Plaintiff has failed to establish the first prong of the prima facie case, Plaintiff's retaliation claim must fail.

Even if Plaintiff were able to establish her prima facie case, ( i.e., that her refusal to go to work was a protected activity, that her termination was an adverse employment action, and that there was a causal connection between the refusal to go to work and her termination) she would still not prevail on her retaliation claim. Under the burden-shifting scheme, Defendant can articulate a legitimate, non-discriminatory reason for the termination of Fox's employment. MSB fired her because she refused to report to work and to do her job. The burden is now on Plaintiff to prove that Defendant's purported reason was mere pretext. Plaintiff has failed to establish pretext. By Plaintiff's own account, Defendant needed and wanted her to continue her work at MSB. Action was taken against her only when she refused to work. There is no evidence that Defendant fired Plaintiff in order to retaliate against Plaintiff.

As Plaintiff has failed to establish her prima facie case and has failed to prove pretext in her discharge, Defendant is entitled to summary judgment on the retaliation claim.

IV.    CONCLUSION

For the foregoing reasons:

1.    Defendant's Motion for Summary Judgment is GRANTED.

2.    Judgment shall be entered by separate Order.

SO ORDERED this _3/2st_ day of January, 2003.


_____
Marvin J. Garbis
United States District Judge